**M.G. BANCORPORATION, INC., a Delaware corporation, and Southwest Bancorp, Inc., a Delaware corporation, Respondents below, Appellants,**

v.

**Richard A. LE BEAU, Dorothy N. Le Beau, Michelle E. Le Beau, Brett Jordan, Brook Jordan, Kurt R. Nebel, Joan M. Nebel, Christine Stucker, David Stucker, Margaret M. Pavletic, Joseph W. Pavletic, D.D.S. individually and for The Joseph W. Pavletic, D.D.S., M.D., As Trustee of The Robert J. Noetzel, D.D.S., M.D. Ltd., Profit**

---

**7.** *Id.*

Sharing and Savings Plan & Trust, John M. Cunningham, III, M. Susan Cunningham and, John M. Cunningham, As Trustee of The John M. Cunningham Trust, Dated 12/19/91, Petitioners Below, Appellees.

No. 153, 1998.

Supreme Court of Delaware.

Submitted: March 9, 1999.
Decided: April 30, 1999.
As Modified on Denial of Reargument May 27, 1999.

Wayne J. Carey, and Ronald A. Brown, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware and Frederick V. Lochbihler, (argued) and David S. Barritt, of Chapman and Cutler, Chicago, Illinois, for appellants.

Bruce L. Silverstein, (argued) and Martin S. Lessner, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for appellees.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT, and BERGER, Justices (constituting the Court en Banc).

HOLLAND, Justice:

This appeal is taken by Respondents-appellants, M.G. Bancorporation, Inc. ("MGB"), and Southwest Bancorp, Inc. ("Southwest"), Delaware corporations, from a final judgment of the Court of Chancery. The proceeding arises from a cash-out merger of the minority shareholders of MGB on November 17, 1993 (the "Merger"). MGB was merged into Southwest, which owned over 91% of the outstanding shares of MGB's common stock, pursuant to 8 *Del.C.* § 253. The Petitioners-appellees were the record owners of 18,151 shares of MGB common stock as of the date of the Merger. The Merger consideration was $41 per share.

The Petitioners initiated an appraisal proceeding, in accordance with 8 *Del.C.* § 262 ("Section 262"), to determine the fair value of MGB's common stock. Following a three-day trial, the Court of Chancery concluded that the fair value of MGB's common stock as of the Merger date was $85 per share. The Respondents were ordered to pay that sum, together with interest, compounded monthly, at the rate of 8% from November 17, 1993.

This Court affirms that portion of the judgment by the Court of Chancery that awarded the Petitioners $85 per share. That portion of the judgment that awarded compound interest to the Petitioners, however, is remanded for further consideration.

### APPELLANTS' CONTENTIONS

On March 30, 1998, the Respondents appealed from the final judgment. The Respondents have raised four issues. First, the Respondents submit that the Court of Chancery erred, as a matter of law, by improperly placing the burden of proof on the Respondents and accepting the "comparative acquisitions" appraisal of the Petitioners' expert witness. Second, the Respondents contend that the Court of Chancery's rejection of other valid valuation methods (e.g., the discounted cash flow method) was contrary to its statutory responsibility to appraise the fair value of the Petitioners' shares independently. Third, Respondents argue that the Court of Chancery violated 8 *Del.C.* § 262(h) and Delaware case law by appraising the fair value of MGB stock on the basis of merger and acquisition transactions which, according to the Respondents, contained acquisition premia unrelated to the fair value of MGB as a going concern. Fourth, the Respondents argue that the Court of Chancery erred in awarding compound interest without any evidence in the record to support its conclusion that a prudent investor expects to receive a compound rate of interest on an investment.

### CROSS–APPELLANTS' CONTENTIONS

On April 14, 1998, the Petitioners cross-appealed. The Petitioners have raised

four separate issues. First, they allege that the Court of Chancery erred, as a matter of law, by requiring the Petitioners to establish "bad faith" to support an award of "costs." Second, the Petitioners contend that the Court of Chancery erred in rejecting certain aspects of the valuation analysis performed by the Petitioners' expert witness. Third, the Petitioners submit that the Court of Chancery made various erroneous evidentiary rulings. Fourth, the Petitioners argue that the Court of Chancery erred in denying their request that the Respondents be assessed attorneys' fees and expert witness fees.

### FACTS

The Petitioners are shareholders who owned 18,151 shares of common stock of MGB before the Merger. The Respondents are Southwest and its subsidiary, MGB. Before the Merger, MGB was a Delaware-chartered bank holding company headquartered in Worth, Illinois. MGB had two operating Illinois-chartered bank subsidiaries, Mount Greenwood Bank ("Greenwood") and Worth Bancorp, Inc. ("WBC"). Both banks served customers in the southwestern Chicago metropolitan area. MGB owned 100% of Mount Greenwood and 75.5% of WBC.

Before the Merger, Southwest owned 91.68% of MGB's common shares. On November 17, 1993, MGB was merged into Southwest in a "short form" merger under 8 *Del.C.* § 253. Because the Merger was accomplished unilaterally, neither MGB's board of directors nor its minority shareholders were legally required to, or did, vote on the transaction.

Southwest engaged Alex Sheshunoff & Co. Investment Bankers ("Sheshunoff") to determine the "fair market value" of MGB's minority shares for the purpose of setting the Merger price. Sheshunoff determined that the fair market value of MGB's minority shares was $41 per share

as of June 30, 1993. Accordingly, MGB's minority shareholders were offered $41 per share in cash as the Merger consideration. The Petitioners rejected that offer, electing instead to pursue their statutory rights, and this appraisal proceeding was commenced.

A stockholders class action based on breach of fiduciary duty was also filed challenging the Merger. On July 5, 1995, the Court of Chancery issued a decision in that companion class action, holding that Sheshunoff had not performed its appraisal in a legally proper manner.[1] The basis for the Court of Chancery's conclusion was that Sheshunoff had determined only the "fair market value" of MGB's minority shares, as opposed to valuing MGB in its entirety as a going concern and then determining the fair value of the minority shares as a pro rata percentage of that value.[2]

### Petitioners' Valuation

At the December 1996 trial, the Petitioners' expert witness was David Clarke ("Clarke"). He testified that as of the Merger date the fair value of MGB common stock was $58,514,000, or $85 per share. In arriving at that conclusion, Clarke used three distinct methodologies to value MGB's two operating bank subsidiaries: the comparative publicly-traded company approach, yielding a $76.24 to $77.50 per share value; the discounted cash flow ("DCF") method, yielding a $73.96 to $72.23 per share value; and, the comparative acquisitions approach, yielding an $85 per share value.

In performing his analysis, Clarke added a control premium to the values of the two subsidiaries to reflect the value of MGB's controlling interest in those subsidiaries. He then added the value of MGB's remaining assets to his valuations of the two subsidiaries. Clarke arrived at an overall fair value of $85 per share for MGB.

---

**1.** *Nebel v. Southwest Bancorp, Inc.,* Del.Ch., C.A. No. 13618, 1995 WL 405750 (July 5, 1995) Mem.Op. at 4.

**2.** *Id.*

At the trial, the Petitioners also introduced evidence of what MGB's fair value would be if Sheshunoff's prior determination were revised as of the Merger date and if its minority discount were eliminated.

### Respondents' Valuation

The Respondents relied upon the expert testimony of Robert Reilly ("Reilly") at trial. He testified that, as of the Merger date, the fair value of MGB common stock was $41.90 per share. Reilly arrived at that conclusion by performing two separate valuations: the discounted cash flow method and a "capital market" analysis. Reilly did not add any control premium to the values of MGB's two subsidiaries, because he determined that a control premium was inappropriate in valuing a holding company such as MGB.

The Respondents did not call anyone from the Sheshunoff firm as an expert witness at trial, even though Sheshunoff s valuation had served as the basis for setting the $41 per share Merger price consideration.

### COURT OF CHANCERY'S DECISION

At the conclusion of the trial, the Court of Chancery had before it: three per share values from Clarke; two per share values from Reilly; and a revision by the Petitioners' witness of the Sheshunoff $41 per share computation. The parties' experts' respective valuation conclusions and the revised Sheshunoff valuation were summarized by the Court of Chancery in the following chart:

| Valuation in $'000's: | WBC | 75.5% of WBC | Greenwood | Other Assets | Total | Per Sh. |
|---|---|---|---|---|---|---|
| Petitioners (Clarke) | | | | | | |
| Comparative Publicly–Traded | | | | | | |
| Method: | 33,059 | 24,960 | 20,952 | 6,814 | 52,726 | 76.59 |
| With Control Premium: | 43,300 | 32,692 | 27,100 | 6,814 | 66,606 | 96.7 6 |
| DCF Method: | 32,075 | 24,217 | 20,079 | 6,814 | 51,110 | 74.25 |
| With Control Premium: | 44,800 | 33,824 | 28,300 | 6,814 | 68,938 | 100.15 |
| Comparative Acquisitions | | | | | | |
| Method: | 38,100 | 28,800 | 22,900 | 6,814 | 58,514 | 85.00 =<br>fair value |
| | | | | | | |
| Respondents (Reilly) | | | | | | |
| Capital Market Method: | | | | | 28,400 | 41.26 |
| DCF Method: | | | | | 29,220 | 42.45 |
| | | | | | Average: | 41.90 =<br>fair value |
| | | | | | | |
| Sheshunoff (Updated) | | | | | | |
| (Without Control Premium) | | | | | | |
| Adjusted Book Value: | | | | | | 64.13 |
| Adjusted Earnings Value: | | | | | | 76.80 |

---

The Court of Chancery concluded that $85 per share was the fair value of MGB's stock on the date of the merger.

### BURDEN OF PERSUASION COLLATERAL ESTOPPEL DOCTRINE

The Court of Chancery's written analysis in its valuation determination contained the following statement:

The fact that Reilly's per share value determination serendipitiously turned out to be only 90 cents per share more than Sheshunoff s legally flawed $41 valuation, cannot help but render Respondents' valuation position highly suspect and meriting the most careful judicial scrutiny. As a matter of plain common sense it would appear evident that a proper fair value determination based upon a going concern valuation of the entire company, would significantly exceed a $41 per share fair market valuation of only a minority block of its shares. If Respondents choose to con-

tend otherwise, it is their burden to persuade the Court that $41.90 per share represents MGB's fair value. The Court concludes that the Respondents have fallen far short of carrying their burden, and independently determines that the fair value of MGB at the time of the Merger was $85 per share.[3]

The Respondents contend that this statement constituted a misallocation of the burden of proof. The Respondents fail to recognize that this statement by the Court of Chancery was a proper application of the collateral estoppel doctrine.

■■■■ Collateral estoppel and res judicata are related principles of law. Res judicata bars a suit involving the same parties based on the same cause of action.[4] Collateral estoppel prohibits a party from relitigating a factual issue that was adjudicated previously.[5] Accordingly, the collateral estoppel doctrine is referred to as the issue preclusion rule.[6]

■■■■ It is not unusual, as in this case, for the same merger to be challenged in a statutory appraisal action and in a separate breach of fiduciary duty damage action.[7] Irrespective of whether the breach of fiduciary duty damage action or the statutory appraisal action is decided first, the doctrine of collateral estoppel provides repose by preventing the relitigation of an issue of fact previously decided.[8] The test for applying the collateral estoppel doctrine requires that (1) a question of fact essential to the judgment (2) be litigated and (3) determined (4) by a valid and final judgment.[9]

In the context of this Merger, the breach of fiduciary duty damage action was adjudicated first. In writing the decision in the statutory appraisal action that is now before this Court, the Court of Chancery specifically noted that it had previously "issued an opinion in the companion class action holding that Sheshunoff had performed its appraisal in a legally improper manner." [10] The Court of Chancery also noted the basis for its "conclusion was that Sheshunoff had determined only the 'fair market value' of MGB's minority shares, as opposed to valuing MGB in its entirety as a going concern and determining the fair value of the minority shares as a pro rata percentage of that value." [11]

■■■■ "Pursuant to the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case." [12] Accordingly, the Court of Chancery's prior holding in the breach of fiduciary duty damage action collaterally estopped the Respondents from relitigating the factual finding which rejected Sheshunoff s opinion that the $41 per share was the fair value of MGB's stock as of June 30, 1993. The record reflects that the Respondents did not even attempt to present an expert witness from the Sheshunoff firm during the statutory appraisal proceeding.

■■■ In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence.[13] Nevertheless, the Respondents were collaterally estopped from arguing in the statutory

3. *LeBeau v. M.G. Bancorporation, Inc.*, Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem.Op. at 7.

4. *Acierno v. New Castle County*, Del.Supr., 679 A.2d 455, 459 (1996).

5. *Id.*

6. *Id.*

7. *See, e.g., Cede & Co v. Technicolor Inc.*, Del.Supr., 684 A.2d 289 (1996).

8. *Columbia Casualty Co. v. Playtex F.P., Inc.*, Del.Supr., 584 A.2d 1214, 1216 (1991).

9. *Tyndall v. Tyndall*, Del.Supr., 238 A.2d 343, 346 (1968).

10. *LeBeau v. M.G. Bancorporation, Inc.*, Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem.Op. at 1.

11. *Id.*

12. *Messick v. Star Enterprise*, Del.Supr., 655 A.2d 1209, 1211 (1995).

13. *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 701 A.2d 357 (1997).

appraisal action that Sheshunoff's $41 determination represented MGB's fair value per share, given the entry of the Court of Chancery's prior holding in the breach of fiduciary duty damage action involving the same Merger. Consequently, it was entirely appropriate for the Court of Chancery to require the Respondents to demonstrate how Reilly's purportedly proper statutory appraisal valuation resulted in only a 90 cents (approximately 2%) per share increase over the legally improper Sheshunoff valuation that had included a minority discount. In doing so, the doctrine of collateral estoppel was correctly applied by the Court of Chancery in the statutory appraisal proceeding.

## EXPERT TESTIMONY REJECTED GATEKEEPING ROLE PROPERLY EXERCISED
### Standard of Review
### Weinberger and Carmichael

The admission of expert witness testimony is provided for in Delaware Rule of Evidence 702. "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." D.R.E. 702. Delaware Rule of Evidence 702 is identical to Federal Rule of Evidence 702.

■ The Respondents contend that the Court of Chancery erred by rejecting certain valuation opinions of both parties' experts. The seminal case on this Court's

jurisprudence in an appraisal proceeding provides guidance on the admission of expert testimony.[14] Proof of value can be established by any techniques or methods that are generally acceptable in the financial community and otherwise admissible in court, subject only to our interpretation of 8 *Del.C.* § 262(h).[15]

Since Delaware Rule of Evidence 702 is identical to its federal counterpart, we rely upon the United States Supreme Court's most recent authoritative interpretation of Federal Rule of Evidence 702. Two weeks after the oral argument in this appeal, the United States Supreme Court expanded upon its construction of Federal Rule of Evidence 702 when it decided *Kumho Tire Co., Ltd. v. Carmichael.*[16] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the United States Supreme Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable."[17] In *Carmichael,* the Court held the basic gatekeeping obligation that had been described in *Daubert* applies to *all* expert testimony on "scientific," "technical" or "other specialized" matters within the scope of Federal Rule of Evidence 702.[18]

In *Daubert,* the United States Supreme Court identified certain factors for the trial judge to consider in discharging his or her "gatekeeping" obligation *e.g.,* "testing, peer review, error rates, and 'acceptability' in the relevant scientific community, some or all of which might prove helpful in determining the reliability of a particular scientific 'theory or technique'."[19] In explaining that the ratio decidendi of *Dau-*

---

14. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983).

15. *Id.* at 713.

16. *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

17. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

18. *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. at ——, 119 S.Ct. at 1174.

19. *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. at ——, 119 S.Ct. at 1171, *quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 593–594, 113 S.Ct. 2786.

*bert* extended to all expert testimony, the United States Supreme Court reaffirmed *Daubert*'s description of the trial judge's Rule 702 inquiry as a "flexible one."[20] The holding in *Carmichael* reiterated that the factors mentioned in *Daubert* do not constitute a "definitive checklist or test" but must be "tied to the facts" of a particular "case."[21]

The United States Supreme Court also held that the law grants the trial judge broad latitude to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case.[22] Accordingly, an appellate court must apply an abuse of discretion standard when "it reviews a trial court's decision to admit or exclude expert testimony."[23] The abuse of discretion standard applies on appeals when reviewing a trial judge's ruling on either the reliability of an expert's methodology or the reliability of an expert's ultimate conclusion.[24] Although this Court is not bound by the United States Supreme Court's interpretation of comparable federal rules of procedure or evidence, we hereby adopt the holdings of *Daubert* and *Carmichael* as the correct interpretation of Delaware Rule of Evidence 702.

### Reilly's "Capital Market" Approach

The qualifications of the Respondents' expert witness, Reilly, were undisputed at trial. The parties were in sharp disagreement, however, about whether Reilly's "capital market" approach was "generally accepted" within the financial community for valuing banks and bank holding compa-

nies. Reilly's capital market analysis used a number of pricing multiples related to the market value of invested capital ("MVIC"). Reilly computed the ratios of MVIC to: earnings before interest and taxes ("EBIT"); earnings before interest, depreciation and taxes ("EBIDT"); debt free net income ("DFNI"); debt free cash flow ("DFCF"); interest incomes; and total book value of invested capital ("TBVIC").

The Petitioners' expert, Clarke, testified that Reilly's capital market approach was not generally accepted in the financial community for valuing banks and bank holding companies. According to Clarke, the financial community focuses upon the ratio of price to book value and price to earnings for purposes of valuing banks and bank holding companies. The Court of Chancery concluded that the Respondents had failed to establish that Reilly's capital market methodology is generally accepted by the financial community for purposes of valuing bank holding companies, as distinguished from other types of enterprises.[25]

The Court of Chancery also determined that Reilly's capital market valuation approach included a built-in minority discount. The Court of Chancery noted that the valuation literature, including a treatise co-authored by Reilly himself, supported that conclusion.[26] The Court of Chancery concluded that because Reilly's capital market method resulted in a minority valuation, even if it had concluded that Reilly's capital market approach was an otherwise acceptable method of valuing a bank holding company, the use of Reilly's

**20.** *Kumho Tire Co., Ltd. v. Carmichael*, —— U.S. at ——, 119 S.Ct. at 1171.

**21.** *Id.* 119 S.Ct. at 1175, *quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 593, 113 S.Ct. 2786.

**22.** *Id.* 119 S.Ct. at 1176.

**23.** *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

**24.** *Kumho Tire Co., Ltd. v. Carmichael*, —— U.S. at ——, 119 S.Ct. at 1176.

**25.** *See Security State Bank v. Ziegeldorf*, Iowa Supr., 554 N.W.2d 884 (1996).

**26.** *See* S.P. Pratt, R.F. Reilly & R.P. Schweis, *Valuing a Business* 194–95, 210 (ed.1996) (explaining that comparative publicly traded companies produce a minority discounted valuation); *See also* C.Z. Mercer, *Valuing Fi-*

capital market approach is improper in a statutory appraisal proceeding.

■■■■ Delaware Rule of Evidence 702, like its federal counterpart, "establishes a standard of evidentiary reliability." [27] Delaware Rule of Evidence 702 "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." [28] When the "factual basis, data, principles, methods, or their application" in an expert's opinion are challenged, the trial judge must decide if the expert's testimony "has a reliable basis in the knowledge and experience of [the relevant] discipline." [29]

■■■ The record reflects that the Court of Chancery rejected Reilly's capital market approach for two independent and alternative reasons. First, it concluded that the Respondents had failed to establish that Reilly's capital market approach is generally accepted in the financial community for valuing banks and/or bank holding companies. Second, it concluded that Reilly's capital market approach contained an inherent minority discount that made its use legally impermissible in a statutory appraisal proceeding. Both of those conclusions are fully supported by the record evidence that was before the Court of Chancery and the prior holdings of this Court construing Section 262.[30]

### Discounted Cash Flow
### Both Experts Opinions Rejected

Both parties' experts also gave valuation opinions using the same discounted cash flow methodology. The qualifications of each parties' expert witness were accepted by the Court of Chancery. The propriety of using a discounted cash flow analysis in a statutory appraisal action was also acknowledged. The discounted cash flow methodology has been relied upon frequently by parties and the Court of Chancery in other statutory appraisal proceedings.

Although Reilly and Clarke used the same discounted cash flow methodology, each applied different assumptions. The Court of Chancery determined, for example, that "the difference between Clarke's 12% discount rate and Reilly's 18% discount rate [was] attributable primarily to their different estimates of MGB's cost of equity capital, and their different assumptions of the company specific risks confronting MGB at the time of the merger." [31] The Court of Chancery disagreed with certain of the other assumptions applied by both of the parties' experts. The Court of Chancery ultimately concluded that it could not rely on the DCF valuation opinion of either parties' expert.[32]

The Respondents submit the *only* significant concern raised by the Court of Chancery with respect to Clarke's DCF analysis involved his use of a 12% discount rate, i.e., it incorporated a 1% small stock premium based on a 1996 study that may contain post-merger data. The Respondents contend that particular error could have been corrected through a mathematical adjustment, i.e., the addition of a 5.2% small stock factor based on a 1992 study (which Clarke had used in several other bank appraisals) results in a 15% discount

*nancial Institutions* 198–200 and Chapter 13 (1992) (explaining that comparative publicly traded company valuation technique produces a minority valuation that requires adding a control premium to be accurate).

27. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 590, 113 S.Ct. 2786.

28. *Id.* at 592, 113 S.Ct. 2786.

29. *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. at ——, 119 S.Ct. at 1175, *quoting Dau-*

*bert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 592, 113 S.Ct. 2786.

30. *See, e.g., Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992); *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983).

31. *LeBeau v. M.G. Bancorporation, Inc.,* Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem. Op. at 10.

32. *Id.*

rate. The Respondents have calculated that the substitution of the 15% discount rate for Clarke's 12% rate produces a fair value for MGB of $57 per share. The Respondents argue the Court of Chancery erred by rejecting their adjusted Clarke discounted cash flow valuation of $57 as a reliable indication of fair value.

 Having accepted the qualifications of both parties' experts and the propriety of using a discounted cash flow model in this statutory appraisal proceeding, the Court of Chancery was not required to adopt any one expert's methodology or calculations *in toto.*[33] Similarly, by recognizing the discounted cash flow model as *one* proper valuation technique, the Court of Chancery was not *required* to use that methodology to make its own independent valuation calculation by either adapting or blending the factual assumptions of the parties' experts. The ultimate selection of a valuation framework is within the Court of Chancery's discretion.[34]

### HOLDING COMPANY VALUATION CONTROL PREMIUM FOR SUBSIDIARY PROPER

The comparative acquisition approach used by Clark included the value of MGB's controlling interest in its two subsidiaries. In conducting his comparative acquisition analysis, Clarke identified three specific transactions involving community banks in the same geographical area as MGB's subsidiaries, and which had occurred within a year of the merger. Clarke also considered data published by The Chicago Corporation in its September 1993 issue of *Midwest Bank & Thrift Survey*, which reflected an analysis of 137 bank acquisitions announced from January 1, 1989 and June 1, 1993.

 The Respondents contend that Clarke's comparative acquisitions approach was erroneously relied upon by the Court of Chancery because that valuation analysis is proscribed by the statutory directives in Section 262, as construed by this Court. The interpretation and application of the mandates in Section 262 to this appraisal proceeding presents a question of law. Therefore, the Court of Chancery's construction of Section 262 must be reviewed *de novo* on appeal.[35]

This Court has held that in valuing a holding company in a statutory appraisal proceeding, pursuant to Section 262, it is appropriate to include a control premium for majority ownership of a subsidiary as an element of the holding company's fair value of the majority-owned subsidiaries.[36] *In Rapid–American,* this Court stated:

> Rapid was a parent company with a 100% ownership interest in three valuable subsidiaries. The trial court's decision to exclude the control premium at the *corporate level* practically discounted Rapid's entire inherent value. The exclusion of a "control premium" artificially and unrealistically treated Rapid as a minority shareholder. Contrary to Rapid's argument, Delaware law *compels* the inclusion of a control premium under the unique facts of this case. Rapid's 100% ownership interest in its subsidiaries was clearly a "relevant" valuation factor and the trial court's rejection of the "control premium" implicitly placed a disproportionate emphasis on pure market value.[37]

Based upon the foregoing statements from *Rapid–American,* the Court of Chancery concluded that Clarke's comparative acquisition approach, which includes a control premium for a majority interest in a subsidiary, was a relevant and reliable meth-

**33.** *Cede & Co v. Technicolor, Inc.,* Del.Supr., 684 A.2d 289, 299 (1996).

**34.** *Id.*

**35.** *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289, 294–95 (1996).

**36.** *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796, 806 (1992).

**37.** *Rapid–American Co. v. Harris,* 603 A.2d at 806–07 (emphasis added).

odology to use in a Section 262 statutory appraisal proceeding to determine the fair market value of shares in a holding company.

The Respondents argue that this Court's holding in *Rapid–American* turned on the "unique fact" that its subsidiaries were involved in three different industries. The Court of Chancery rejected the Respondents' construction of *Rapid–American* as "too narrow." We agree. The fact that the holding company being valued in *Rapid–American* owned subsidiaries engaged in different businesses was not the dispositive basis for our holding.

"The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred."[38] Accordingly, the corporation must be valued as a going concern based upon the "operative reality" of the company as of the time of the merger.[39] Therefore, *any* holding company's ownership of a controlling interest in a subsidiary at the time of the merger is an "operative reality" and an independent element of value that must be taken into account in determining a fair value for the parent company's stock.[40]

The Court of Chancery properly concluded that the rationale of this Court's holding in *Rapid–American* applied to the MGB appraisal proceeding. Because MGB held a controlling interest in its two subsidiaries, it was necessary to determine the value of those controlling interests in order to ascertain the value of MGB, as a whole, as a going concern on the Merger date.[41] We hold that the Court of Chancery acted in accordance with the statutory parameters of Section 262 by making a per share fair value determination of MGB on the basis of the comparative acquisitions approach applied by Clarke, using the premia that he attributed to MGB's controlling interests in Greenwood and WBC.

## COURT OF CHANCERY INDEPENDENTLY APPRAISED SHARES

The Respondents contend that the Court of Chancery failed to discharge its statutory obligation to function as an independent appraiser. The record does not support that argument. In its appraisal opinion, the Court of Chancery stated:

The Court is mindful that $85 per share is more than double the Merger price. The Court is also aware of its role under § 262, which is to determine fair value *independently*. In discharging that institutional function as an independent appraiser, the Court should, where possible, test the soundness of its valuation conclusion against whatever reliable corroborative evidence the record contains. On that score the record falls far short of perfection. Limited corroborative evidence is available, however, in the form of Sheshunoff's 1993 fair market valuation, (i) adjusted by Clarke to exclude Sheshunoff's minority discount and (ii) updated by Clarke to reflect value data as of November 17, 1993, the date of the Merger.[42]

In discharging its statutory mandate, the Court of Chancery has the discretion to select one of the parties' valu-

**38.** *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 684 A.2d 289, 298 (1996), *citing Cavalier Oil Corp. v. Harnett*, Del.Supr., 564 A.2d 1137, 1144 (1989). *See also Tri–Continental Corp. v. Battye*, Del.Supr., 74 A.2d 71, 72 (1950).

**39.** *Cede & Co. v. Technicolor, Inc.*, 684 A.2d at 298.

**40.** *Rapid–American Co. v. Harris*, 603 A.2d at 806–07.

**41.** *Rapid–American Co. v. Harris*, 603 A.2d at 806–07; *In re Appraisal of Shell Oil Co.*, Del.

Supr., 607 A.2d 1213, 1218 (1992). *See also Hintmann v. Fred Weber, Inc.*, Del.Ch., C.A. No. 12839, 1998 WL 83052, Steele, V.C. (Feb. 17, 1998) Mem.Op. at 25; R.F. Balotti & J.A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 9.57, at 9–117 (3d ed. 1999 Supp.); R. Ward, Jr., E. Welch, A. Turezyn, *Folk on the Delaware General Corporation Law* § 262.9 (4th ed.1999).

**42.** *LeBeau v. M.G. Bancorporation, Inc.*, Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem.Op. at 12.

ation models as its general framework or to fashion its own.[43] The Court of Chancery's role as an independent appraiser does not necessitate a judicial determination that is completely separate and apart from the valuations performed by the parties' expert witnesses who testify at trial. It must, however, carefully consider whether the evidence supports the valuation conclusions advanced by the parties' respective experts. Thereafter, although not required to do so, it is entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record.[44]

■ In this case, the Court of Chancery carefully evaluated the valuation testimony and evidence proffered by the parties' experts. It determined that Reilly's capital market approach is legally impermissible, but even if valid, was improperly applied, thereby requiring the rejection of the values Reilly derived by that method. The Court of Chancery found that both Clarke's and Reilly's DCF analyses were improperly applied, thereby requiring the rejection of the values both experts derived by that approach.

The Court of Chancery concluded that Clarke's comparative acquisition approach was a legally valid method to value MGB and that the credible record evidence supported Clarke's $85 per share determination of MGB's fair value as of the Merger date. In making its independent appraisal valuation, the Court of Chancery could have relied entirely upon Clarke's comparative acquisitions approach. Instead, it critically tested Clarke's comparative acquisition approach by using its own judicial expertise to make corrective adjustments to Sheshunoff's legally improper valuation determination and found corroboration for Clarke's result.

■ The determination of value in a statutory appraisal proceeding is accorded a high level of deference on appeal.[45] In the absence of legal error, this Court reviews appraisal valuations pursuant to the abuse of discretion standard.[46] The Court of Chancery abuses its discretion when either its factual findings do not have record support or its valuation is not the result of an orderly and logical deductive process.[47]

In this case, the findings of fact upon which the Court of Chancery predicated its decision are supported by the record. The analysis that preceded the Court of Chancery's valuation of MGB's shares exemplifies an orderly and logical deductive process. Consequently, the portion of the Court of Chancery's judgment that concluded that $85 per share was the fair value of MGB stock on the date of the Merger is affirmed.

Appraisal actions are highly complicated matters that the Court of Chancery is uniquely qualified to adjudicate in an equitable manner. Since *Weinberger*,[48] this Court has eschewed choosing any one method of appraisal to the exclusion of all others.[49] Today, we reinforce the substance of this philosophy and support methods that allow the Court of Chancery

43. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (1996); *Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 701 A.2d 357, 362 (1997).

44. *Cede & Co. v. Technicolor, Inc.*, 684 A.2d at 299. *See also Gonsalves v. Straight Arrow Publishers, Inc.*, 701 A.2d at 361–62.

45. *Rapid–American Corp. v. Harris*, Del.Supr., 603 A.2d 796, 802 (1992); *In re Appraisal of*

*Shell Oil Co.*, Del.Supr., 607 A.2d 1213, 1219 (1992).

46. *Rapid–American Corp. v. Harris*, 603 A.2d at 802.

47. *Id., citing Alabama By–Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 259 (1991).

48. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983).

49. *Id.* at 713–14.

to perform its statutory role as appraiser, based on a solid foundation of record evidence, independent of the positions of the parties.[50]

### RATE OF INTEREST
### RECORD REQUIRES REMAND

■ Section 262(h) provides that the Court of Chancery "shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation together with a *fair rate of interest,* if any, to be paid upon the amount determined to be the fair value."[51] Section 262 permits an award of compound interest at the discretion of the Court of Chancery. Such an award, however, is the exception rather than the rule.[52]

The Respondents contend that the Court of Chancery erred by awarding compound interest in the absence of any evidence or finding that exceptional circumstances were present to support that award. In this case, the Court of Chancery stated that "in today's financial markets a prudent investor expects to receive a compound rate of interest."[53] That ruling appears to be consistent with what this Court has observed is a developing trend toward the routine awarding of compound interest.[54]

■ This Court recently reaffirmed that the Court of Chancery has broad dis-

cretion under the appraisal statute to award either simple or compound interest.[55] We noted, however, that the "option provided by 8 *Del.C.* § 262(i) precludes, *ipso facto,* the routine application of a standard which may have no relation to the record evidence or the merits of the appraisal proceeding. In short, the statute provides discretion to choose on a case-by-case basis, but requires explanation for the choice."[56] We have concluded that, as in *Straight Arrow,* we must remand this matter to the Court of Chancery for an elaboration upon its decision to award compound interest, on the basis of the record established in this case.

### COSTS ASSESSMENT DISCRETION
### PROPERLY EXERCISED
### OTHER CROSS CLAIMS MOOT

■ In their cross-appeal, the Petitioners challenge the Court of Chancery's decision to deny their request for an award of attorneys' and expert witness' fees. Section 262(j) provides that costs may be taxed upon the parties as the court deems equitable under the circumstances. Generally, the Petitioner in an appraisal proceeding "should bear the burden of paying its own expert witnesses and attorneys," unless some equitable exception applies.[57]

■ The Petitioners invoked the equitable exception of bad faith conduct on the part of the Respondents. Although some of the cases cited by the Petitioners demonstrate that costs were assessed against the surviving corporation even in the absence of a showing of bad faith, those cases all recognized that the decision to award

**50.** *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992); *Gonsalves v. Straight Arrow Publishers, Inc.,* Del.Supr., 701 A.2d 357 (1997).

**51.** 8 *Del.C.* § 262(h) (emphasis added).

**52.** *See Cede & Co. v. Technicolor Inc.,* Del. Supr., 684 A.2d 289, 302 (1996); *Ryan v. Tad's Enterprises, Inc.,* Del.Ch., C.A. Nos. 10229, 11977, 1996 WL 936160, Jacobs, V.C. (Apr. 24, 1996), *aff'd,* Del.Supr., 693 A.2d 1082 (1997).

**53.** *LeBeau v. M.G. Bancorporation, Inc.,* Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem.Op. at 12.

**54.** *Gonsalves v. Straight Arrow Publishers, Inc.,* Del.Supr., No. 232, 1998, 1999 WL 87280, Berger, J. (Jan. 5, 1999) Order at * *4.

**55.** *Id.*

**56.** *Id.*

**57.** *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 684 A.2d 289, 301 (1996); *In re Radiology Assoc., Inc., Litig.,* Del.Ch., 611 A.2d 485, 501 (1991).

costs is vested within the Court of Chancery's discretion.[58] The record in this case does not support the contention that the Court of Chancery's decision denying an award of fees to the Petitioners' constituted an abuse of discretion.[59] It is unnecessary to address the other claims raised in the cross-appeal.

### Conclusion

The portion of the Court of Chancery's judgment that appraised the fair value of the Petitioners' stock at $85 per share is affirmed. The portion of the judgment that awarded compound interest is remanded for further proceedings in accordance with this opinion. Jurisdiction is retained only with regard to the issue of awarding compound interest.[60]

## ON MOTION FOR REARGUMENT

Bancorp has filed a motion for reargument. The motion contends that the Court of Chancery could not properly apply the doctrine of collateral estoppel in the appraisal proceeding with regard to its prior holding in the separate companion class action that the Sheshunoff valuation "had determined only the 'fair value' of MGB's minority shares, as opposed to valuating MGB in its entirety as a going concern and determining the fair value of the minority shares as a pro rata percentage of that value."[61] In support of that contention, Bancorp notes that the determination by the Court of Chancery was made in the context of an interlocutory ruling in the companion class action that had not become a final judgment.

The record in the appraisal proceeding, however, reflects the Court of Chancery's holding in the class action became the functional equivalent of a final judgment by virtue of a stipulated pretrial order.

Prior to the commencement of trial in the appraisal action, the parties stipulated as to "facts that are admitted and require no proof," *inter alia*:

> The valuation of the shares of Bancorporation performed by Sheshunoff was a valuation of a minority interest in Bancorporation. Sheshunoff did not value 100% of the stock of Bancorporation, and then divide that value by the number of shares outstanding. In addition, the valuation performed by Sheshunoff was performed as of June 30, 1993, and Sheshunoff did not update the valuation through the date of the merger.

Since the parties stipulated that the Sheshunoff valuation was an improper method for determining the fair market value of shares in an appraisal proceeding, it was entirely appropriate for a court of equity to apply the collateral estoppel doctrine to a holding that had become *final* because it was no longer in dispute.

In support of its motion for reargument, Bancorp also asserts that "there were errors in the Sheshunoff valuation which made it unreliable for any valuation purpose." Bancorp protests too much.[62] That assertion reinforces the logic of the following observation by the Court of Chancery in the appraisal opinion: "The fact that Reilly's per share value determination serendipitiously turned out to be only 90 cents per share more than Sheshunoff's legally flawed $41 valuation cannot help but render [Bancorp's] valuation position highly suspect and meriting the most careful judicial scrutiny."[63]

Bancorp's motion for reargument is denied.

**58.** *In re Radiology Assoc., Inc., Litig.,* 611 A.2d at 501.

**59.** *Cede & Co. v. Technicolor Inc.,* 684 A.2d at 301–02.

**60.** Supr.Ct.R. 19(c).

**61.** *LeBeau v. M.G. Bancorporation, Inc.,* Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem Op. at 1.

**62.** William Shakespeare, *Hamlet, Prince of Denmark* act 3, sc. 2.

**63.** *LeBeau v. M.G. Bancorporation, Inc.,* Del. Ch., C.A. No. 13414, 1998 WL 44993 (Jan. 29, 1998) Mem Op. at 7.