# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

MEGHAN A. ADAMS
Judge[1]

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0634

July 30, 2025

E. Chaney Hall, Esq.
Joshua K. Tufts, Esq.
Fox Rothschild LLP
1201 N. Market Street, Suite 1200
Wilmington, DE 19801

Thomas A. Uebler, Esq.
Kathleen A. Murphy, Esq.
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

> **RE:** ***ASC Intermediate Holding Company and Advanced Fire Protection Systems, LLC v. Bernard Jammet and Justin Szurek***
> <u>**C.A. No. 2024-0992-MAA**</u>

Dear Counsel:

This Letter Opinion and Order resolves Defendants' partial Motion to Dismiss (the "Motion").[2] For the reasons discussed below, the Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND[3]

### A. The Parties

Plaintiff ASC Intermediate Holding Company ("ASC") is a Delaware

---

[1] Sitting as a Vice Chancellor of the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to In re Designation of Actions Filed Pursuant to In re: DESIGNATION OF THE HONORABLE MEGHAN A. ADAMS under Del. Const. art. IV § 13(2) dated February 6, 2024.

[2] *See* Defendant Bernard Jammet and Justin Szurek's Motion to Dismiss Counts III, IV and V of Plaintiffs' Verified Complaint (D.I. 9); *See* Opening Brief of Defendants Bernard Jammet and Justin Szurek in support of their Motion to Dismiss (hereafter "MTD") (D.I. 11).

[3] The facts described herein are drawn from the Verified Complaint and the documents attached thereto or incorporated therein. *Kim v. Coupang, LLC*, 2021 WL 3671136, at *4 (Del. Ch. Aug. 19, 2021). *See also* Verified Complaint (hereafter "Compl.") (D.I. 1). Those facts are accepted as true solely for the purpose of ruling on the Motion.

1

corporation with its principal place of business in Maryland.[4]  Plaintiff Advanced Fire Protection Systems, LLC (the "Company," together with ASC, "Buyers") is a Maryland LLC.[5]  The Company provides "fire and life safety system services to commercial property owners and building managers."[6]

Defendants Bernard Jammet ("Jammet") and Justin Szurek ("Szurek," together with Jammet, "Sellers") are individual residents of Maryland.[7]

### B. The Transaction and the SPA

In February 2023, the parties executed the Securities Purchase Agreement (the "SPA"), pursuant to which Sellers transferred the Company's Membership Interest to Buyers (the "Transaction").[8]

The SPA provides for an "Initial Purchase Price" of "$28,000,000 (i) plus Estimated Cash, (ii) minus Estimated Closing Indebtedness, (iii) minus Estimated Selling Expenses, (iv) minus the Escrow Amount, (v) minus the Rollover Amount[.]"[9]  Pre-closing, Sellers had to deliver an "Estimated Closing Statement" to Buyers, providing a "good faith estimate" of the Company's: (i) Cash; (ii) Closing Indebtedness; (iii) Selling Expenses; and (iv) Net Working Capital (the "Price

---

[4] Compl. ¶ 7.
[5] *Id.* ¶ 8.
[6] *Id.* ¶ 1.
[7] *Id.* ¶¶ 9-10.
[8] *Id.* ¶ 1; *see* Compl., Ex. A ("SPA") § 2.1.  Capitalized terms in the Court's discussion of the SPA's purchase price mechanism are defined in Article 1 of the SPA.  *See* SPA Art. 1.  These definitions are not relevant to resolving the Motion and are therefore omitted.
[9] *Id.* § 2.2(a).

Adjustment Factors").[10]  The Initial Purchase Price would then be adjusted based on how the Price Adjustment Factors compared to a target baseline, to generate the "Net Purchase Price."[11]

The SPA also provides a post-Closing Net Purchase Price adjustment mechanism.[12]  Within 120 days of closing, Buyers could deliver a "Closing Statement" articulating their own calculation of the Price Adjustment Factors.[13] Sellers could then submit an "Objection Notice" disputing the Closing Statement.[14] If, after good faith negotiations, the parties failed to resolve the issues raised in the Objection Notice, they agreed to submit any remaining dispute to arbitration.[15] Critically, "[t]he scope of the disputes to be resolved by [arbitration] is limited to the items set forth in the Objection Notice that remain unresolved at the time" of arbitration."  The parties agreed that "all determinations made by [the arbitrator] will be final, conclusive and binding on the parties hereto and will not be subject to appeal or further review."[16]

---

[10] *Id.* § 2.2(c).
[11] *Id.* § 2.2(a).
[12] *Id.* § 2.3.
[13] *Id.* § 2.3(a).
[14] *Id.* § 2.3(b).  Notably, "[a]ny items not disputed in the Objection Notice will be deemed to have been accepted by the Sellers." *Id.*
[15] *Id.*  The parties agreed to submit all other disputes "to the exclusive jurisdiction of the courts of the Delaware Court of Chancery[.]" *Id.* § 8.11.
[16] *Id.* § 2.3(b).

Article IV of the SPA details the "Representations and Warranties of the Sellers."[17] The representations and warranties in Sections 4.10,[18] 4.17,[19] 4.19,[20] and 4.24[21] are central to the parties' dispute. ASC disclaimed reliance on any extra-contractual representations and warranties.[22]

---

[17] *See* SPA Art. 4.

[18] *See id.* § 4.10. Because Section 4.10 contains 21 subparts, the Court does not reproduce the entire text here. The Complaint does not articulate which subparts Defendants allegedly breached. *See generally* Compl. Based on the Complaint's allegations, the Court surmises Sellers rely on Section 4.10(p) which represents the Company has not "accelerated revenues or collection of accounts receivable or deferred expenses or the payment of accounts payable, other than in the Ordinary Course of Business." SPA § 4.10(p); *see* Compl. ¶¶ 31-45.

[19] SPA § 4.17 ("[e]xecpt as set forth on Schedule 4.17(b), [] the Financial Statements present fairly, in all material respects, the financial position, results of operations . . . of the Company . . . and have been prepared by the management of the Company in accordance with GAAP, consistently applied throughout the periods indicated.").

[20] *Id.* § 4.19 ("[a]ll of the accounts receivable of the Company represent sales actually made in the Ordinary Course of Business or valid claims as to which full performance has been rendered by the Company. Except as set forth on Schedule 4.19 all of such accounts receivable are, in the aggregate, collectible in full, net of the reserve therefor, in the Ordinary Course of Business.").

[21] *Id.* § 4.24 ("[a]ll of the books and records of the Company have been maintained in the Ordinary Course of Business and fairly reflect, in all material respects, all transactions of the Company.").

[22] *Id.* § 5.7 ("[ACS] acknowledges and agrees that it has conducted its own independent review and analysis of the business, assets, condition and operations of the Company. In entering into this Agreement, [ACS] (for itself and on behalf of its Affiliates and representatives): (a) specifically acknowledges that it has relied solely upon its own investigation and analysis of the information and documentation contained in the Data Room and the representations and warranties of the Sellers set forth in **ARTICLE 4**; (b) specifically acknowledges that none of the Sellers or any other Person is making and has not made any representation or warranty, expressed or implied, at law or in equity, other than the representations and warranties set forth in **ARTICLE 4** and (c) specifically and irrevocably disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges that the Sellers and their respective Affiliates hereby specifically disclaim any such other representation or warranty made by any Person." (emphasis in original)).

4

## C. The Company's Pre-Transaction Accounting Practices and the Parties' Arbitration.

Post-closing, ASC "discovered [] the Company's financial statements were inaccurate in several material respects and not prepared in accordance with GAAP."[23] Buyers allege the improper accounting "artificially inflated the purchase price by tens of millions of dollars" and "forced" ASC "to infuse another $7 million of support equity into the Company[.]"[24] The Complaint also asserts Sellers' revenue recognition practices fraudulently induced ASC to enter the Transaction.[25] Similarly, Buyers allege Sellers' actions breached the representations and warranties in Sections 4.10, 4.17, 4.19, and 4.24 of the SPA.[26]

After discovering the accounting discrepancies, Buyers delivered a Closing Statement contesting the Estimated Closing Statement's calculations.[27] Sellers responded with an Objection Notice.[28] After negotiations failed, the parties

---

[23] Compl. ¶¶ 31-33. Specifically, ASC alleges it learned "the Company had been invoicing customers and recognizing revenue in advance of performing corresponding services (and in advance of incurring the corresponding costs)," despite Sellers "repeatedly represent[ing] . . . that it was the Company's accounting policy to recognize revenue only upon invoicing a customer based on a percentage of completion basis, not that customers would be billed in advance of work being done." *Id.* ¶¶ 34-35. Moreover, Buyers contend "Szurek would [] purposefully disregard [] information" regarding how to bill customers "on a percentage of completion basis," violating Company policies and GAAP, "and instead cause the Company to bill for work that had not yet been done or in many cases work that had not yet even started." *Id.* ¶ 35.

[24] *Id.* ¶ 40.

[25] *Id.* ¶¶ 62-68. Buyers challenge Sellers' "material misrepresentations and omissions . . . regarding the financial condition and financial statements of the Company, including with regard to revenue, margins and revenue growth," made "[p]rior to the execution of the [SPA]." *Id.* ¶ 63.

[26] *Id.* ¶¶ 69-75.

[27] *Id.* ¶ 21.

[28] *Id.* ¶ 23.

5

submitted their dispute to Plante Moran (the "Arbitrator") for resolution pursuant to Section 2.3(b) of the SPA (the "Arbitration").[29]

In the Arbitration, the Arbitrator determined:

> [t]he total aggregate value of the Disputed Items between the parties, according to the information provided to us by the disputed parties in connection with this dispute resolution process, is $3,629,953, of which we find in favor of [ACS] for $3,022,122 and Seller[s] for $607,831. Based on our determinations for the Disputed Items, a Purchase Price Adjustment Shortfall exists . . . which totals $3,150,701 [(the "Purchase Price Adjustment")].[30]

Critically, the Arbitrator found "of the Disputed Items . . . Billings in Excess of Costs . . . fall under the definition of Indebtedness within the [SPA]," and "Accounts Receivable [] and Accrued Expenses are included in the calculation of Net Working Capital[.]"[31]  Post-Arbitration, ASC demanded Sellers release the escrow funds and make payments to address the Purchase Price Adjustment.[32]  Buyers filed this action when Sellers refused to release the escrowed funds.[33]

---

[29] *Id.* ¶ 24; *see* SPA § 2.3(b).

[30] Compl., Ex. B ("Final Ltr.").  Plante Moran also determined Sellers owe ACS "$41,236 in order for the payment of fees between parties to comply with Section 2.3(b) of the [SPA]." *Id.*

[31] *Id.*

[32] Compl. ¶ 29.

[33] *Id.* ¶ 30.  The Complaint asserts five causes of action: Count I – Confirmation of Arbitration Award; (2) Count II – Breach of Contract (Purchase Price Adjustment); (3) Count III – Fraudulent Inducement (Financial Condition and Statements); (4) Count IV – Breach of Contract (Financial Condition and Statements); and (5) Breach of Contract (Indemnification).  *Id.* ¶¶ 46-80.

## II. DISCUSSION

Sellers' Motion asks the Court to dismiss Counts III, IV, and V for several reasons.[34] First, Sellers argue the Arbitration already addressed Buyers' claims, and the SPA prohibits ASC from seeking additional relief.[35] Second, the Motion argues the SPA's anti-reliance clause bars Count III, which also does not comply with Rule 9(b).[36] Third, Sellers contend Count IV is insufficiently pled.[37] Finally, the Motion asserts Count V should be dismissed, because the SPA eliminates any right to indemnification for issues addressed by the Arbitrator.[38]

As discussed below, the Court finds that *Agspring, LLC v. NGP X Holdings, L.P.*[39] compels dismissal of Counts III and IV because the Arbitration already resolved the factual dispute underlying Buyers' claims. Accordingly, the Court does not address the Motion's arguments concerning the sufficiency of Plaintiffs' pleadings. Dismissal is not proper regarding Count V, however, because Buyers may be entitled to indemnification associated with Counts I and II.

---

[34] MTD at 13. Buyers note Sellers do not challenge the Purchase Price Adjustment's validity or object to confirmation of the award. MTD Opp'n at 1-2. Accordingly, the Motion does not implicate Counts I and II. *Id.*

[35] MTD at 14-19.

[36] *Id.* at 19-23.

[37] *Id.* at 23-24.

[38] *Id.* at 24-25.

[39] 2022 WL 170068 (Del. Ch. Jan. 19, 2022).

## A. Collateral Estoppel Bars Counts III and IV.

Sellers argue the Arbitration bars Counts III and IV under the doctrines of *res judicata*[40] and collateral estoppel.[41]  The Court concludes collateral estoppel provides the proper test to evaluate Defendants' argument.[42]  Collateral estoppel prohibits a party from re-adjudicating a previously determined fact where:

[40] "*Res judicata* operates to bar a claim where the following five-part test is satisfied: (1) the original court had jurisdiction over the subject matter and the parties; (2) the parties to the original action were the same as those parties, or in privity, in the case at bar; (3) the original cause of action or the issues decided was the same as the case at bar; (4) the issues in the prior action must have been decided adversely to the appellants in the case at bar; and (5) the decree in the prior action was a final decree." *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 192 (Del. 2009) (internal quotes omitted).

[41] MTD at 14-19.  The Motion is not clear regarding whether Sellers' argument should be analyzed under *res judicata* or collateral estoppel.  Sellers focus the bulk of their argument on *res judicata*. *Compare id.* at 14-18 (arguing *res judicata* bars Buyers' claims), *with id.* at 18-19 (arguing collateral estoppel bars Buyers' claims).  This comports with the *Agspring* court's analysis which held, "Delaware courts give valid and final arbitration awards the same effect as a court's judgment under the doctrine of *res judicata*." *Agspring*, 2022 WL 170068, at *6.  Yet, collateral estoppel seems a better fit, given that Sellers argue the Arbitration already decided *the factual issue* regarding the proper classification of the billing and accounting issues. *See* MTD at 1-2; *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999) ("[c]ollateral estoppel prohibits a party from relitigating a factual issue that was adjudicated previously."); *Smernoff, Trustee Under Gerald N. Smernoff Revocable Trust Dated May 24, 2000 v. King's Grant Condominium Association, Inc.*, 2024 WL 3384826, at *5-6 (Del. Ch. July 12, 2024) (analyzing whether a previous arbitration barred plaintiff's claims under the collateral estoppel doctrine).

[42] While *res judicata* bars Count IV for the same reasons discussed regarding collateral estoppel, it is not clear claim preclusion applies to Count III.  Given § 2.3(b)'s limited scope, the Arbitrator likely did not have jurisdiction to decide Buyers' fraudulent inducement claim. *See* SPA § 2.3(b). This is an inconsequential distinction because the SPA's anti-reliance clause independently bars Count III, which is based on "Sellers [allegedly] [] material misrepresentations and omissions" made "[p]rior to the execution of the [SPA]." Compl. ¶¶ 62-68; *see* SPA § 5.7 ("irrevocably disclaim[ing] . . . rel[iance] upon any [] [] representations or warranties" "other than the representations and warranties set forth in ARTICLE 4[.]"); *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. May 19, 2004) (holding an extra-contractual fraud claim is barred where the agreement contains "a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.").  Nevertheless, the Court considers the Arbitration's preclusive effect under collateral estoppel, which bars both Counts III and IV.

(1) The issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[43]

Buyers argue collateral estoppel does not apply, because the Arbitrator "did not make[] any factual determinations necessary for Plaintiff[s] to prove either their fraudulent inducement or their breach of contract claims."[44]  That position ignores the Arbitrator's determination regarding the proper classification of the Company's billing and accounting irregularities.

The Arbitrator concluded Sellers' "Billings in Excess of Costs . . . fall under the definition of Indebtedness within the [SPA]," and issues concerning "Accounts Receivable [] and Accrued Expenses are included in the calculation of Net Working Capital[.]"[45]  That factual determination bars Counts III and IV.  Counts III and IV rely on the same underlying conduct – Sellers' improper billing and accounting

---

[43] *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. 1993)).

[44] MTD Opp'n at 13-14.  Defendants also argue, without any precedential support, "to the extent [] collateral estoppel would be applicable to this case at all, it would likely operate *against* Defendants, because the arbitration was decided against them." *Id.* at 14 (emphasis in original). Yet, the Court finds no Delaware authority which supports the proposition that collateral estoppel only applies to facts decided against a parties' interest.  Rather, the Supreme Court of Delaware has stated, "collateral estoppel . . . [gives] preclusive effect [to] *any* factual determination that is made in the first [adjudication] to be decided." *Box v. Box*, 697 A.2d 395, 399 (Del. 1997) (emphasis added).

[45] Final Ltr.  That finding is "final, conclusive and binding on the parties." SPA § 2.3(b).

practices.[46] The SPA grants the Arbitrator exclusive jurisdiction to decide disputes related to "Indebtedness" and "Net Working Capital."[47]  Hence, the Arbitrator's classification determination divests the Court of jurisdiction to resolve Counts III and IV.  The Arbitrator also decided the remedy for Sellers' conduct under the SPA's terms – the Purchase Price Adjustment.[48]  That determination of Buyers' "rights" is subject to collateral estoppel.[49]  Therefore, collateral estoppel prohibits Plaintiffs from seeking additional damages for the same underlying harm.[50]  For these reasons, the Court **GRANTS** the Motion and dismisses Counts III and IV pursuant to collateral estoppel.

---

[46] *See* Compl. ¶¶ 31-45 (mapping Sellers' accounting and billing practices onto the allegedly fraudulent/breached provisions of the SPA); 63 ("Sellers made material misrepresentations and omissions to Purchaser regarding the financial condition and financial statements of the Company, including with regard to revenue, margins and revenue growth."); 72 ("Sellers have breached their obligations in the Agreement in terms of multiple representations and warranties regarding the financial condition and financial statements of the Company, including with regard to revenue, margins and revenue growth.").

[47] *See* SPA § 8.11 (memorializing the Arbitrator's jurisdiction to decide "matters . . . pursuant to Section 2.3(b)")' *Id.* § 2.3(b) (vesting the Arbitrator with authority to decide disputes regarding "the Closing Statement and the calculation of the Closing Working Capital."); *Id.* § 2.3(a) (defining "Closing Statement" to include any dispute regarding the calculation of "Indebtedness" and "Net Working Capital").

[48] *See* Final Ltr.

[49] *See Smernoff*, 2024 WL 3384826, at *5 n.52 (quoting *PVP Aston, LLC v. Fin. Structures Ltd.*, 2023 WL 2728775, at *7 (Del. Super. Mar. 31, 2023)).

[50] Awarding Buyers additional damages would also violate "the double recovery rule," which "prohibits a plaintiff from recovering twice for the same injury from the same [defendant]." *Brookfield Asset Management, Inc. v. Rosson*, 261 A.3d 1251, 1277 (Del. 2021).

**B. Dismissal of Count V is Improper Because Plaintiffs may be Entitled to Indemnification Associated with Counts I and II.**

Defendants argue Sections 7.3(f) and 7.3(g) of the SPA compel dismissal of Count V.[51] Count V seeks indemnification for "damages . . . including, but not limited to attorneys' fees" associated with Buyers' enforcement of their rights under the SPA.[52] The dismissal of Counts III and IV obviates Buyers' request for "losses relating to Sellers' fraud and breaches of representations and warranties."[53] Plaintiffs implicitly conceded this at oral argument.[54] Yet, Buyers also clarified, "part of [the] indemnification claim is the post-arbitration expenses for Counts I and II[.]"[55] Sellers do not address the indemnity potentially available if Buyers prevail on Counts I and II.[56] Sections 7.3(f) and 7.3(g) do not implicate indemnification

---

[51] MTD at 24-25 (citing SPA §§ 7.3(f) ("no Indemnifying Party shall have any Liability . . . for Losses to the extend such Losses were specifically and expressly included in the calculation of any post-[c]losing adjustment, as finally determined pursuant to Section 2.3(b)."); 7.3(g) ("Purchaser shall not be entitled to indemnification for any matter that was included as a current liability in the calculation of the Closing Working Capital as finally determined under Section 2.3, or [] included in the Indebtedness or the Selling Expenses as finally determined pursuant to Section 2.3.")).

[52] Compl. ¶¶ 76-80.

[53] *Id.* ¶ 79. Sections 7.3(f) and 7.3(g) bar any indemnification related to Buyers' allegations concerning "the financial condition and financial statements of the Company, including with regard to revenue, margins and revenue growth." *Id.* Those provisions absolve Defendants of any indemnity obligation related to a purchase price rejection, Net Working Capital, and Indebtedness. *See* SPA §§ 7.3(f)-(g). As discussed above, the Arbitrator concluded the dispute regarding Sellers' billing and accounting practices fell within Net Working Capital/Indebtedness and necessitated the Purchase Price Adjustment. *See supra* II.A.

[54] *See* Transcript of 4-14-2025 Oral Argument on Defendants' Motion to Dismiss at 37-38 (D.I. 25) ("*if either Counts III or IV survive . . .* so does the indemnification claim." (emphasis added)).

[55] *Id.* at 38.

[56] *See generally* MTD; MTD Reply.

11

associated with Counts I and II.[57]  Accordingly, the Court **DENIES** the Motion regarding Count V, because Plaintiff could potentially receive indemnification pursuant to Count I and II.

### III.    CONCLUSION

For the foregoing reasons, the Court dismisses Counts III and IV, but Count V remains outstanding.  Sellers' Motion is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams
**Meghan A. Adams, Judge**

---

[57] *See* MTD at 24-25 (only relying on Sections 7.3(f) and 7.3(g) to argue Count V should be dismissed); MTD Reply at 15-17 (same).